FILED
04/30/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 10, 2018 Session

**IN RE EMMA S.**[1]

**Appeal from the Chancery Court for Rutherford County**
**No. 16CV-1300      Howard W. Wilson, Chancellor**

_____

**No. M2017-01243-COA-R3-PT**

_____

A mother's parental rights were terminated on the ground of abandonment by willfully failing to visit her daughter. Mother appeals, arguing that the petition initiating the proceeding did not include the notice required by Rule 9A of the Tennessee Rules of Civil Procedure; that the record did not contain clear and convincing evidence that she abandoned her child; and that termination was not in the child's best interest. Upon our review, we conclude that the proof does not clearly and convincingly establish the ground of abandonment by failure to visit. We reverse the judgment of the trial court and dismiss the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

J. Stephen Aymett, Jr., Murfreesboro, Tennessee, for the appellant, Joy S.

Nathan A. White, Murfreesboro, Tennessee, for the appellees, Jennifer and Michael A.

Amy Broom Pollina, Murfreesboro, Tennessee, Guardian *ad litem*

Christopher H., Rome, Georgia, *Pro Se*

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

# OPINION

## I. Factual and Procedural Background[2]

This is an appeal from an order terminating the parental rights of Joy S. ("Mother") to her daughter, Emma S. Mother and Christopher H. ("Father") are the biological parents of Emma S., born in December 2012; at the time of her birth, Mother and Father resided in Ellijay, Georgia.[3] Emma resided with both parents until August of 2013, when Mother was incarcerated for a probation violation; Emma continued to reside with Father. In June 2014, Father asked his cousin Jennifer A., who lives in Murfreesboro, Tennessee, to care for Emma while he sought treatment for a drug addiction; Jennifer A. and her husband Michael (collectively, "Petitioners") agreed to do so and brought Emma to live with them on July 29, 2014.

Petitioners filed a petition for temporary custody of Emma in the Rutherford County Juvenile Court in December 2014 to allow them to add Emma to their health insurance; Petitioners received custody of her by order entered in March 2015. On July 28 of that year Petitioners initiated a proceeding to have Emma declared dependent and neglected. After having been released from jail in August 2015, Mother was incarcerated again in late January 2016 for failing to report to probation, for giving a police officer the wrong name, and for failing a drug test. On March 12, 2016, Emma was adjudicated dependent and neglected, and Petitioners were granted full legal custody of her. On August 29, 2016, Petitioners filed a petition to terminate the parental rights of Mother and Father to Emma and for adoption, alleging abandonment by failing to visit and support her and by wanton disregard for her welfare, substantial non-compliance with the permanency plan, and persistence of conditions as grounds for termination.

Mother, who was still incarcerated at the time the petition was filed, and Father both filed *pro se* answers to the petition; the trial court found Mother to be indigent and appointed counsel for her. The court also appointed a Guardian *ad Litem*. A trial was held on May 3, 2017, at which four witnesses testified on behalf of Petitioners. Mother was incarcerated in Georgia at the time of the trial, and her deposition was introduced into evidence. Father did not appear at trial in person or through counsel.

---

[2] This background is taken largely from the order under appeal. Unless otherwise noted, the factual history is not disputed.

[3] Mother was married to another man at the time of Emma's birth; an order was entered in a related dependent and neglect proceeding stating that Father "admitted that he is the biological father of Emma…" and declaring him to be her legal father pursuant to Tennessee Code Annotated section 36-2-305. Father did not participate in the trial of this case, and the termination of his parental rights are not at issue in this appeal.

By order entered May 22, 2017, the trial court terminated Mother's and Father's rights on the grounds of abandonment by failure to visit; the court deemed the proof as to all other grounds for termination to be insufficient. The court also examined the best interest factors at Tennessee Code Annotated section 36-6-113(i) and determined that termination of Mother and Father's rights was in Emma's best interest. Mother appeals, stating the following issues for our review:

I. Whether or not Appellant's failure to personally sign the Notice of Appeal deprives the Court of jurisdiction and the appeal should be dismissed.

II. Whether or not the termination of Mother's parental rights should be reversed because Petitioner's Petition fails to comply with the requirement of Rule 9A of the Tennessee Rules of Civil Procedure that it contain language advising Mother of the expedited appeal provisions of Rule 8A of the Tennessee Rules of Appellate Procedure.

III. Whether or not the record supports the trial court's finding that clear and convincing evidence existed that Mother abandoned Emma by willfully failing to visit her in the four months preceding the filing of Petitioner's Petition.

IV. Whether or not the record supports the trial court's finding that clear and convincing evidence existed that termination of Mother's parental rights was in the best interest of Emma.

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated under certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard

of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## III. ANALYSIS

### A. Notice of Appeal

Petitioners moved to dismiss the appeal on the basis that Mother failed to personally sign the notice of appeal, as required by Tennessee Code Annotated section 36-1-124(d). While the appeal was pending, our Supreme Court decided *In re Bentley D.*, holding that the statute does not require a notice of appeal to be signed personally by the appellant and that the timely notice of appeal signed by the attorney of the parent whose rights were terminated satisfies the signature requirement. *In re Bentley D.*, 537 S.W.3d 907, 909 (Tenn. 2017). At oral argument, Mother's counsel conceded that the Supreme Court decision has rendered this issue moot.

### B. Rule 9A Notice

Mother argues that the petition to terminate her rights is deficient because it fails to comply with Rule 9A of the Tennessee Rules of Civil Procedure, which states:

> In addition to meeting all other applicable rules governing the filing of pleadings, any complaint or petition seeking a termination of parental rights shall contain the following notice: "Any appeal of the trial court's final disposition of the complaint or petition for termination of parental rights will be governed by the provisions of Rule 8A, Tennessee Rules of Appellate Procedure, which imposes special time limitations for the filing

of a transcript or statement of the evidence, the completion and transmission of the record on appeal, and the filing of briefs in the appellate court, as well as other special provisions for expediting the appeal. All parties must review Rule 8A, Tenn. R. App. P., for information concerning the special provisions that apply to any appeal of this case."

The petition to terminate Mother's rights does not contain this notice, and has not been amended to include the language in the Rule.

Mother argues the petition is defective and "caused Mother to be uninformed from the outset, which defeats the purpose of the rule," that this "omission and error by Petitioners was harmful and prejudicial," and that therefore, her rights should not have been terminated. Although not raised as matters of concern in her brief in chief, in her reply brief, Mother asserts that the petition also fails to comply with Tennessee Code Annotated sections 36-1-113 and 36-6-224 by failing to include the present address of Emma and the Petitioners, the addresses of the persons whom Emma had lived with prior to living with the Petitioners, the case number of the prior proceeding concerning the custody of Emma, and a statement of whether Petitioners knew of any proceeding that could affect the current proceeding before the court. While acknowledging that the notice was not included in the petition, Petitioners respond that the petition otherwise complies with the pertinent statutes and rules, that Mother has not shown that she was prejudiced by the omission, and, therefore, the error should be considered harmless.

Mother and Petitioners each rely on *In re Natalie R.C.*, No. E2011-01185-COA-R3-PT, 2011 WL 4924170 (Tenn. Ct. App. Oct. 18, 2011), in support of their positions. In that case, a father appealed the termination of his parental rights asserting, among other issues, that the trial court erred in not dismissing the petition due to what the father contended were fatal defects in the petition, *viz.*, failure to include the Rule 9A notice, failure to comply with Tennessee Code Annotated section 36-1-113(d)(3)(A)(i)[4] and (C)[5], and section 36-6-224.[6] The trial court held that the affirmative defenses raised by the father were without merit, proceeded to address the merits of the petition, and terminated the father's rights. On appeal, this court rejected the petitioning grandmother's argument

---

[4] Tennessee Code Annotated section 36-1-113(d)(3)(A)(i) requires that the petition to terminate parental rights include a statement that the putative father registry had been consulted within ten days of the filing of the petition and if there was any claim on the registry to the child who was the subject of the proceeding.

[5] Tennessee Code Annotated section 36-1-113(d)(3)(C) requires language in the petition relating to the effect of the termination of the parent's rights to notice of and ability to object to adoption proceedings.

[6] Tennessee Code Annotated section 36-6-224 requires that the petition include certain statistical information, as well as the existence and history of any other proceeding involving the child or which could otherwise affect the termination proceeding.

that the petition "sufficiently complied with all relevant rules and statutes" and could be excused. *Id.* at *4-5. We held that the omissions were "deficiencies which, taken together, render the petition defective," but did not agree with the father that "the defects [were] fatal and require[d] the petition to be dismissed." *Id.* at 5. Noting that the defects could be cured, we vacated the decision and remanded the case to afford the petitioner the opportunity to do so. *Id.*

The recent case of *In re Bentley D.*, No. E2016-02299-COA-R3-PT, 2018 WL 1410903, (Tenn. Ct. App. Mar. 21, 2018), wherein a father appealed the termination of his parental rights, presented similar facts and legal issues to the case at bar. In that case, the trial court held that the petition's failure to include the information required by Tennessee Code Annotated section 36-1-113(d)(3)(A)(i) and sections 36-1-113(d)(3)(C)(ii) and (iii)[7] did not make the defects fatal; on motion, the court allowed the petition to be amended to correct the defects. *Id.* at *1. On appeal, we rejected the father's argument, based on *In re Natalie R.C.*, that the petition should have been dismissed, holding:

> In *In re Natalie R.C.*, the termination petition had multiple defects, the omission of the Tenn. R. Civ. P. 9A notice being one of them. The appellate court found that all of the deficiencies together made the petition defective, but also noted that "[p]erhaps any one of the deficiencies alone might have constituted harmless error." Moreover, the appellate court determined that the appropriate remedy was not dismissal. Rather, it held that "[t]hese defects are such that they can be corrected by [petitioner] and her current attorney if given the opportunity, and they choose to do so." The court vacated the trial court's judgment and remanded for further proceedings.

2018 WL 1410903, at *3.

---

[7] Tennessee Code Annotated section 36-1-113(d)(3)(C) states:

(C) The petition to terminate, or the adoption petition that seeks to terminate parental rights, shall state that:
* * *
> (ii) The child will be placed in the guardianship of other person, persons or public or private agencies who, or that, as the case may be, shall have the right to adopt the child, or to place the child for adoption and to consent to the child's adoption; and
> (iii) The parent or guardian shall have no further right to notice of proceedings for the adoption of the child by other persons and that the parent or guardian shall have no right to object to the child's adoption or thereafter, at any time, to have any relationship, legal or otherwise, with the child.

6

In the case before us, there is no evidence that the defects in the petition prejudiced Mother; indeed none of the deficiencies were raised in the trial court. Mother initially filed her answer *pro se*, and her appointed counsel did not seek to amend her answer or address any defect by motion. In her initial brief on appeal, Mother complained only of the Rule 9A omission; the asserted violations of information required by the statute were not raised until Mother's reply brief. Mother has pursued a timely appeal and has complied with the process imposed at Rule 8A of the Tennessee Rules of Appellate Procedure. Under the record presented, the omission of these items was harmless error.

### C. Abandonment by Willful Failure to Visit

Abandonment is identified as a ground for termination in Tennessee Code Annotated section 36-1-116(g)(1) and defined in section 36-1-102(1)(A), which reads in pertinent part:

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
> ***
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

We first address Mother's argument that a finding that she had engaged in conduct that displayed a wanton disregard for the welfare of Emma was necessary in order to find that she had abandoned her daughter. Mother argued in her brief and at oral argument that this Court's decision in *In re Audrey S.* dictates that before an incarcerated parent can be determined to have abandoned their child, the court must make a finding that the parent engaged in conduct displaying wanton disregard for their child's welfare. This is not a correct reading of *In re Audrey S.*

Tennessee Code Annotated section 36-1-102(1)(A)(iv), quoted above, identifies three distinct ways an incarcerated parent can be held to have abandoned a child for

7

purposes of terminating that parent's rights: (1) willfully failing to support the child during the four month period preceding incarceration, (2) willfully failing to visit the child during the four month period preceding incarceration, or (3) engaging in conduct prior to incarceration that exhibits a wanton disregard for the child's welfare. *In re Audrey S.* held that the statute provided two tests for abandonment where the parent is incarcerated, the first of which:

> prevents a parent from relying on his or her own criminal behavior and resulting imprisonment as a defense to the termination of his or her parental rights by allowing the court to examine the record of visitation and support during the most recent period for which the excuse of incarceration is unavailable. . . .

and the second of which:

> does not make incarceration alone a ground for the termination of parental rights. . . [but allows] [a]n incarcerated or recently incarcerated parent [to be] found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child.

182 S.W.3d at 866.

Neither the statute nor the case law interpreting it support the contention that a finding of wanton disregard is required in order for a court to find that an incarcerated parent has abandoned a child by failing to visit or support the child; Mother's argument to the contrary is without merit. Accordingly, we proceed to discuss the sufficiency of the evidence to support the ground of termination.

As respects this ground, the court made factual findings as to Mother's failure to visit:

> On August 9, 2015, Mother was released from the Bleckley Probation Detention Center. On the day of her release, she contacted [Petitioners] to arrange visitation with the Child; however, visitation did not occur. Mother informed [Petitioners] of her plans to come to Murfreesboro with a friend who was then continuing on to Indiana. On August 24, 2015, she asked the [Petitioners] if she could spend the night at their home while visiting the Child; however, although it is undisputed that [Petitioners] were agreeable to her visit with the Child, they were not open to Mother's request to stay overnight at their home. Mother claimed that she was unable to make other arrangements, and her plans fell through. [Petitioners] testified that the

8

conversation with Mother on August 24, 2015 was the last time she made contact with them or requested to visit with the Child.

Despite being out of jail during the fall of 2015, Mother made no further attempts to visit with the Child. Although she claims that she was subject to special circumstances, including her lack of access to transportation and her difficulty in leaving the State of Georgia due to her supervised probation, Mother never even attempted to make further contact with the Child by telephone or otherwise arrange for her visitation with the Child. Mother turned to drugs in the months following her release from prison, and this choice soon landed her back in prison for the purpose of serving the sentence that she was originally ordered to serve.

On the basis of those findings, the court determined that Mother's failure to visit was willful:

Accordingly, the Court finds that Mother's actions, along with her lack of contact with [Petitioners] or the Child, clearly indicate her willful failure to visit. Thus, Petitioners have proven grounds for the termination of her parental rights pursuant to Tenn. Code Ann. §31-1-102(1)(A)(iv).

Mother does not take issue with the court's factual findings or contend that they are not supported by the evidence; upon our review, with the exception the finding that Mother had "difficulty in leaving the State of Georgia due to her supervised probation,"[8] the evidence does not preponderate against the findings.[9] Mother argues that the evidence was not clear and convincing that her failure to visit Emma willful, and that the record "in fact supports the opposite conclusion: that Mother did everything she could to try and visit Emma until she realized Petitioners were never going to allow it to happen."

This Court discussed willfulness in the context of parental right termination cases in *In re Audrey S.*:

---

[8] Mother's counsel said during opening argument that "Mother can't leave the State [of Georgia]"; there is no testimony or other evidence to support the court's finding that her probation imposed a limit on out of state travel.

[9] The petition was filed August 29, 2016, while Mother was incarcerated. After finding that Mother's most recent period of incarceration began on January 20, 2106, the trial court determined that the relevant four-month period for was August 9, 2015, through January 20, 2016. The court did not explain how it determined the period which, by our calculation, is a little over five months; we do note that the court stated that Mother was released from jail on August 9, 2015, violated her probation, and was returned to jail on January 20, 2106. Inasmuch as the period used by the court exceeds the four month period required by the statute, our review of this ground for termination is not adversely impacted.

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . . Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. . . . Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially.

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

182 S.W.3d at 863-64 (citations and footnotes omitted).

Evidence pertinent to this issue came from Jennifer A. and Mother. Jennifer A. testified that about three months prior to Mother's release from incarceration on August 9, Mother's "phone calls dropped off," but after her release from prison, Mother contacted Jennifer A. to tell her that she would like to see Emma; that on August 24 Mother called "wanting to come for a visit because she had a friend that was driving through Tennessee on her way to Kentucky and Indiana . . . [a]nd [Mother] wanted to come and visit Emma and take her with her to these states"; and that she told Mother that "she was more than welcome to visit" but she could not stay overnight with Petitioners and could not take Emma overnight or out of the state. Jennifer A. testified that she had not heard from Mother since August 24, 2015.

Relative to her actions during the time period Mother testified as follows:

10

Q. All right. How do you feel -- how do you feel about the -- Emma living with [Petitioners], just from an overall standpoint?

A. Overall, I'm very grateful for them, for everything that they do for her. I don't know where she would be without their help. I'm very, very grateful. I don't have any bad things to say about them except that they didn't allow me to see her, and that really bothers me.

In fact, I -- I fell apart when that fell through, you know. And I didn't handle that in a way that I'm proud of, but, you know, today, I feel like I'm a different person than I was back then.

I've gone through so many changes from being here. I'm completely clean of all mental health medicine. I don't take any medicine whatsoever, and I work very closely with my counselor and psychologist, and they think I'm doing very well without medications.

I think I used them as a crutch in my past, and I'm – I'm a totally different, stable person than I was when they first met me, even over the telephone. And I just wish that I would have a chance to -- to be a part of my daughter's life.

***

Q. Again, ma'am, I'm only referring to this period from August 9th, 2015, to January 26, 2016.

What did you do during that period of time to get Emma back?

A. Well, I was trying to get somewhere to live.

Q. I'm not talking about trying. I'm asking actually what did you do during that period of time to get Emma back?

A. I don't have a good answer for that.

Q. Okay. All right.

A. I mean, I -- when -- when they wouldn't bring her to me like we had originally agreed, I got very upset, and I reacted in a very bad way by getting, you know, myself in trouble again. Absolutely, it was the wrong choice on every front. You're 100 percent right about what you are going to say about me in that way, but it was never my intention to give my daughter away. And I know that it will never be in her best interest to not have me in her life. I'm her mother. And even though I haven't been the best mother that she could have had, I'm still there, and I'm not going to give up trying to be there.

Q. Okay. Well, just --

A. Even though I'm not able to be there right now, I've done anything in my power to be here on this phone, and that took some effort on the part of my lawyer and me. I guess, probably, if I hadn't filed that answer, I wouldn't have even been given this opportunity, but I'm grateful for it.

***

Q. Okay. So why haven't you made any contact with Emma or [Petitioners] since August of 2015?

11

A. Well, since I've been -- since January of 2016, I've not had access to their address or phone number. I mean, I know what city they live in, but I don't have their -- I don't have access to it. And I've asked people to give it to me, but I haven't been able to get it.

Q. Okay.

A. I think I've been completely defeated. You know, for a little while, I felt like there was no way that I could win in this situation, but I just couldn't give up. You know, I love my daughter too much. Even though I know my actions don't look – don't point in that direction sometimes, I love my daughter, and I want to be a part of her life. And I know that they're doing a great job taking care of her right now, and I'm so grateful that she has them. But I don't believe in my heart that it will ever be in her best interest to not know me and not to have access to me.

\*\*\*

Q. Okay. And how far is Ellijay from Murfreesboro?

A. Six hours away.

Q. Six hours from Ellijay --

A. Yes.

Q. -- to Murfreesboro? I think you need to look at *Google* maps, but, regardless, you found a way to get to Atlanta. You found transportation to Atlanta, didn't you?

A. I did.

Q. To party?

A. I did.

Q. Okay. But you -- that was a choice that you made instead of finding transportation to Murfreesboro to come up here and see Emma, correct?

A. I don't know how I was going to be able to – I mean, without their permission, without their cooperation, it was not going to be possible, sir.

Q. But you never came here. Regardless, you never made the attempt to come up here?

A. I -- I did make attempts, but no successful attempts.

Mindful of our role as the reviewing court to determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish" the element of willfulness, upon our review we are not left with the "firm conviction" that Mother's failure to visit was willful. *In re Alysia S.*, 460 S.W.3d at 572. Mother's testimony quoted above addresses the elements of willfulness as set forth in *In re Audrey S.*; specifically, her capacity to visit, her attempts to visit, and whether she had a justifiable excuse for not visiting. It was Petitioners' burden to prove these elements to the extent that there is "no serious or substantial doubt about the correctness" of the conclusion that her failure to visit was willful. *Id*.

12

Granting Mother the deference due her in the absence of an adverse credibility determination[10] or evidence to the contrary, her testimony shows that she was clearly concerned about her daughter and desired to visit with her but, for various reasons, was unable to do so.  Upon leaving jail Mother's first call was to request permission to visit Emma.  The trial court made a finding that Petitioners "would not bring [Emma] to Georgia, and [Mother] would not be permitted to take [Emma] out of the home for overnight visitation"; as noted earlier, Petitioners advised Mother that she could not stay overnight with them.  There is no evidence that Mother was unwilling to meet the conditions in order to visit Emma; rather, the evidence is unrebutted that she was unable to do so. In other testimony, Mother stated that she did not have a driver's license or a vehicle and was dependent on others for the drive to Murfreesboro.  Taken in context and in its entirety, the evidence preponderates against the trial court's finding of willfulness.

This ground of abandonment by failure to visit was not clearly and convincingly established by Petitioners, and we reverse the judgment of the trial court in that regard. In light of our disposition of this issue, our review of the court's best interest determination is pretermitted.

## III. CONCLUSION

For the foregoing reasons, the judgment of the trial court terminating Mother's parental rights is reversed.[11]

RICHARD H. DINKINS, JUDGE

---

[10] We do not fault the trial court for not making a credibility determination, given that Mother's testimony was by deposition.

[11] Our resolution of this appeal does not affect the existing order in the dependent and neglect proceeding granting legal custody of Emma to Petitioners.